UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

| | |
|---|---|
| ROBERT LEE JONES, | ) |
| Petitioner, | ) Case No. 4:03-cv-159 |
| v. | ) Honorable Wendell A. Miles |
| THOMAS BIRKETT, | ) **REPORT AND RECOMMENDATION** |
| Respondent. | ) |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

On April 27, 2001, after a jury trial in the Kalamazoo County Circuit Court, Petitioner was convicted of two counts of Unarmed Robbery, MICH. COMP. LAWS § 750.530. On June 4, 2001, Petitioner was sentenced to nineteen to forty years for each conviction, to run concurrently. In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

I.  WHETHER THE POLICE FAILURE TO PRESERVE THE SMALL TELEVISION WHICH PETITIONER'S FINGERPRINTS WERE ALLEGEDLY TAKEN VIOLATED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE CROSS-EXAMINATION AND HIS DUE PROCESS RIGHT TO A FAIR TRIAL.

II. PETITIONER WAS DENIED HIS RIGHT TO A FAIR TRIAL BY THE PROSECUTOR'S REPEATED ATTEMPTS TO ELICIT SYMPATHY FOR THE ELDERLY VICTIMS.

    III.    THE TRIAL COURT SHOULD HAVE SUPPRESSED THE PETITIONER'S ALLEGED STATEMENTS WHERE THE POLICE FAILED TO MAKE AN AUDIO OR VIDEO RECORDING OF THE INTERROGATION.

    IV.    A NEW TRIAL IS REQUIRED BECAUSE OF THE CUMULATIVE EFFECT OF THE ERRORS.

Respondent has filed an answer to the petition (docket #23) stating that the grounds should be denied because they are procedurally barred, not cognizable in federal habeas corpus proceedings, or have no merit. Upon review and applying the AEDPA standards, I find that grounds I and IV are without merit, ground II is procedurally barred, and ground III is not cognizable in a federal habeas corpus proceeding. Accordingly, I recommend that the petition be denied.

## Procedural History

### A. Trial Court Proceedings

The state prosecution arose from the October 16, 2000 robbery of Cecilia and Norman Bruex. Petitioner was charged with two counts of unarmed robbery. Petitioner's jury trial began on April 24, 2001, and concluded on April 27, 2001.

At trial, the prosecution introduced the testimony of eight witnesses. Cecilia Bruex, who was eighty-one years old at the time of trial (Tr. 206 ), testified that on October 16, 2000, at approximately 9 p.m., two men appeared at the Bruex's rear door claiming their car had an overheated engine, and asking for water. The men brought a pail, and Mrs. Bruex and one of the men went into the kitchen. (Tr. 207). The other man and Mr. Bruex remained on the landing near the rear door. Mrs. Bruex had never seen the men before. (Tr. 207). Mrs. Bruex described the men as in their late twenties or early thirties, black, with one approximately five feet tall and the other a

little taller. (Tr. 208). While Mrs. Bruex was filling the pail at the kitchen sink, the shorter man grabbed her around the neck, knocked her to the floor, and dragged her into the living room. (Tr. 209). He sat on her chest while he rifled her purse which had been lying on the davenport. (Tr. 210). The second man called out that Mr. Bruex's wallet was in a back room on the desk. Mrs. Bruex's captor dragged her into the back room, found Mr. Bruex's wallet, and left the room. (Tr. 212). Mrs. Bruex left the room to search for Mr. Bruex, finding him lying at the bottom of the basement stairs with the taller man holding him down. (Tr. 213). After determining that Mr. Bruex was not injured, Mrs. Bruex returned upstairs and observed that the shorter man had moved two televisions and a VCR into the kitchen, and a small television from the back room onto a table in the dining area. (Tr. 213). The taller man, who had never gone into the back room left the house (Tr. 238), and called out to the shorter man "come on Bill, come on Bill, let's go, let's go." (Tr. 214). The shorter man left the house with the two televisions and the VCR, but did not take the small television he had earlier removed from the back room and placed on the dining area table. (Tr. 215). The police dusted the small television for fingerprints at the scene, but did not remove the television from the Bruex's home. (Tr. 232, 233). The following day, the Bruex's daughter cleaned the television. (Tr. 233).

Mrs. Bruex has macular degeneration. (Tr. 216). At the time of the incident, Mrs. Bruex's right-eye vision was 20/20, but by the time of trial her vision had deteriorated. (Tr. 239-240). During a line-up, Mrs. Bruex was not able to identify Petitioner as one of the assailants. (Tr. 241). At trial, Mrs. Bruex was permitted to approach the defendant to within twelve inches of his face, which she testified was approximately as close as he was to her while he had held her on the floor. (Tr. 217). She could not identify him as her attacker, other than he was about the same size. (Tr. 219).

3

Mrs. Bruex's husband, Norman Bruex, who was 83 years old at the time of trial (Tr. 244), also testified. In most respects, his testimony was essentially identical to the testimony of Mrs. Bruex. When Mr. Bruex answered the rear door on October 16, Mr. Bruex observed an older, light-colored car in the driveway, which he thought was a Lincoln or similarly-sized car. (Tr. 246). He described the assailants as black individuals, one five foot and six to seven inches, and the other slightly taller. (Tr. 247). He had never seen the men before. (Tr. 247). He testified that while Mrs. Bruex was filling the pail at the kitchen sink, the taller assailant pushed Mr. Bruex down the basement steps, and sat on Mr. Bruex's legs as he laid at the bottom of the stairs. (Tr. 248). Both men had left the house before Mr. Bruex was able to return upstairs. (Tr. 250). Mr. Breux was not able to identify the Petitioner as one of the assailants. (Tr. 262).

Julie Abrams, the Bruex's neighbor, testified that on the day of the robbery, at approximately 5 p.m., she observed a large, white car driving very slowly down her street. She believed it was an older Lincoln or Cadillac. (Tr. 266). She could not identify the driver other than it was a black individual. (Tr. 267).

Lawrence Czarnowski, a Kalamazoo County Deputy Sheriff, testified that he obtained latent fingerprints from the small television that he was told one assailant had moved from the back room. (Tr. 288). Eight latent prints were visible on the bottom and side of the small television set. (Tr. 293, 311). After lifting the latent prints and marking them properly, he placed them into an envelope and turned them over to Officer Mike Major of the Kalamazoo Township Police Department. (Tr. 293). He did not seize the small television as evidence (Tr. 307), because he considered the fingerprints to be the evidence (Tr. 308), nor did he note the television's serial number. (Tr. 315-316). Deputy Czarnowski recommended that smaller items such as credit cards

and Mr. Bruex's wallet be sent to the City of Kalamazoo crime laboratory to obtain fingerprints. (Tr. 319, 332). Officer Major confirmed that he received the prints from Deputy Czarnowski. (Tr. 331). He also saw no need to seize the small television as evidence because prints had already been lifted from the television. (Tr. 335). He did not record the serial number. (Tr. 338).

Gerald Luedecking testified that he was a laboratory technician with the Kalamazoo Department of Safety, (Tr. 343), and had received a request from the Kalamazoo Township Police Department to obtain prints from small items from the Bruex's home. (Tr. 345). Mr. Luedecking testified that televisions generally do not have the best surface for obtaining latent prints. (Tr. 354), and that under the right conditions an undisturbed fingerprint could last for years. (Tr. 353). He also testified that using the laboratory process of lifting latent prints, known as the cyanoacrylate fuming process, would damage a television's circuit board. For this reason, it is best to obtain prints at the scene in order not to destroy the victim's property. (Tr. 368-369).

Michigan State Police Officer Thomas Flowers, of the Grand Rapids Forensic Science Laboratory, testified as an expert latent print examiner. (Tr. 421). Officer Flowers testified that on October 23, 2000, he received 14 latent fingerprint lifts from the Kalamazoo Township Police Department (Tr. 422), with a request to run them through the Automated Fingerprint Identification System ("AFIS"). (Tr. III, 426). The AFIS is a computer data base that will search a fingerprint that has been scanned into the system against persons who have previously been fingerprinted in Michigan. (Tr. III, 426). He did not receive a match. Officer Flowers further testified that the AFIS is not perfect, and that approximately twenty percent of the fingerprints he runs through the system result in a match. (Tr. III, 429). On October 30, 2000, Officer Flowers received a second packet from the Kalamazoo Township Police Department which contained one latent fingerprint card with

5

Petitioner's fingerprint. (Tr. III, 431). Officer Flowers compared the fingerprint card with the latent fingerprints from the crime scene that he had received earlier. (Tr. III, 432). Five fingerprints from the crime scene were identified as having been made by the Petitioner. (Tr. III, 439-440). Officer Flowers stated he was "emphatically," one hundred percent certain of these findings (Tr. III, 440), and, in his opinion, no other fingerprint expert could disagree with his findings. (Tr. III, 444).

Doug Westrate of the Michigan State Police also testified as an expert latent fingerprint examiner. (Tr. III, 450). Officer Westrate verified Officer Flower's conclusions as to each of the five matches (Tr. III, 453), testifying that he was one hundred percent certain of the identifications. (Tr. III, 456).

The detective in charge of the investigation, Stephen Rickey of the Kalamazoo County Police Department, testified that on October 25, 2000, Petitioner's name was mentioned to him as a possible suspect. On October 26, 2000, he met with Petitioner. (Tr. 382). Petitioner acknowledged he drove a white, 1993 Cadillac (Tr. 386), but denied any involvement in the robbery. (Tr. 387). Petitioner's fingerprints were taken and mailed to the Michigan State Police Crime Lab with the request to compare them to the fingerprints recovered at the scene. (Tr. 388, 404). On November 30, 2002, Detective Rickey received a report from the Crime Lab stating that Petitioner's fingerprints matched the fingerprints taken from the crime scene (Tr. 405), at which time Detective Rickey requested a warrant for Petitioner's arrest. (Tr. III, 481).

Petitioner was arrested on December 4, 2000. (Tr. III, 481). Detective Rickey testified that Petitioner stated that on the night of the robbery he had driven two men to the Bruex's home, but did not go into the house. (Tr. III, 485). Detective Rickey informed Petitioner that his fingerprints had been found inside the house. Petitioner then stated he wanted to make a deal, and

the conversation ended. (Tr. III, 485). No other persons were present during this conversation. (Tr. III, 486). The conversation was not tape recorded. (Tr. III, 486). Detective Rickey testified that he generally interviews an arrestee at great length before summarizing the conversation on tape. (Tr. III, 486). However, in this case, the interview never reached this stage. Detective Rickey took notes during the conversation with Petitioner, which he transferred into his police report (Tr. III, 487), and destroyed the notes as soon as he had completed the report. (Tr. III, 488).

Petitioner testified on his own behalf. According to Petitioner, he spent October 16, 2000 at his girlfriend's house. At approximately 7:00 p.m., he loaned his 1993 white Cadillac to his girlfriend's daughter, Otia Somerville. She returned the automobile at approximately 11:00 p.m. (Tr. III, 491). He denied any involvement in the robbery at the Bruex's residence. (Tr. III, 492). He denied making any of the statements testified to by Detective Rickey, including that he wished to make a deal (Tr. III, 496), or that he had driven two men to the Bruex's home. (Tr. III, 499). Petitioner opined that his parole officer had mentioned his name to Detective Rickey as a suspect because Petitioner drove a white Cadillac, had failed a urine drug screen, and had failed to report for a meeting with the parole officer. (Tr. III, 497). Thereafter, law enforcement "fabricated" his fingerprints and falsely accused him of the robbery. (Tr. III, 501, 511).

Otia Sommerville supported Petitioner's testimony, stating that on October 16, 2000 at 7:00 p.m., Petitioner was at her mother's house, and she borrowed Petitioner's white, 1993 Cadillac. (Tr. IV, 528). She returned the automobile to her mother's home at 11:00 p.m., and Petitioner was still present at the home. (Tr. IV, 529).

During closing arguments the prosecutor stated in relevant part:

Why were these folks attacked? Why were they robbed? Because

7

> they were seen as the perfect target.  They were elderly; they were weaker; they were easy.  (Tr. 558)
>
> . . .
>
> He and his companion assaulted elderly people for the sole purpose of stealing their property. (Tr. 564)
>
> . . .
>
> You sir, are responsible for attacking two elderly people on October 16th, 2000, at 1708 Harvey.  You sir, are responsible for terrifying and brutalizing these people just to steal their property.  You are responsible for shattering whatever tranquility those folks may have had in their own home in the golden years of their life so you could have a couple of TVs, VCR, and whatever cash you can get your hands on.  (Tr. 565).
>
> . . .
>
> Take a minute and think about 81 year old Cecilia Bruex.  She is not  looking her best in this photograph because she has just been punched.  Think about 83 year old Norman Bruex laying at the bottom of his own stairwell with his head on the ground and his feet pointed upward as someone held him down. (Tr. 565).

At the conclusion of trial, the jury found Petitioner guilty of both counts of unarmed robbery.  (Tr. IV, 597).  On June 4, 2001, Petitioner was sentenced as an habitual offender, fourth offense, to serve two terms of nineteen to forty years to run concurrently. (Sentencing Tr. 20, docket # 18).

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals, raising the same four issues as raised in his petition for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket # 19.)  By unpublished opinion entered on March 20, 2003, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. *(See* 3/20/03 Mich. Ct. App. Opinion ("MCOA Op."), docket # 19*).*

Petitioner filed a delayed application for leave to appeal to the Michigan Supreme Court, raising the same four claims raised and rejected by the Michigan Court of Appeals. By order entered September 29, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. *(See* Mich. Ord., docket # 20.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. This Court also may not consider decisions of lower federal courts in determining whether

the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law,

10

unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

11

**Discussion**

**I.    Sixth Amendment and Due Process: Ground 1**

Petitioner claims that he was denied his Sixth Amendment right to cross-examination and Fourteenth Amendment right to due process where the police failed to preserve the small television from which his fingerprints were taken. Before trial, Petitioner filed a motion to suppress the fingerprint evidence obtained from the small television. The trial court denied the motion without prejudice, finding there was no evidence that the decision not to preserve the small television was made in "bad faith" as required by Michigan law, but indicating it would readdress the issue if Petitioner later came forward with evidence of bad faith. (Dkt. # 12, Motion transcript "MT", 34 and 35). Upon review, the Michigan Court of Appeals found that:

> In this case, defense counsel was able to confront and cross-examine the prosecution witnesses. His theory was that the police fabricated the evidence against defendant. Defendant explored this theory by questioning the prosecution witnesses who lifted the fingerprints, processed the crime scene, and decided not to seize the television set He was not deprived of his Sixth Amendment rights to confrontation or cross-examination.
>
> Moreover, we disagree that defendant was deprived of *effective* cross examination because of the missing television set. In *People v. Cullens*, 55 Mich. App. 272, 274-275, 222 NW 2d 315 (1974), this Court acknowledged that the fingerprints themselves, and not the object on which they are found, are the evidence. Fingerprints are actually lifted from the object during the fingerprinting process. *Id.* at 273 n. 1. In *Cullens*, the defendant argued that he was denied effective cross- examination because the object from which his prints were lifted was destroyed by the police. *Id.* This Court disagreed because the prints were lifted from the item and preserved. *Id.* They could have been examined by the defendant. *Id.* In this case, the relevant evidence, the fingerprints, was preserved and could have been examined by defendant or an expert in preparation of his defense. Defendant was not deprived of the evidence necessary to rebut the fingerprint identification.

(MCOA Op. at 3, emphasis in original).

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him." U.S. CONST., Am. VI. A primary interest secured by the Confrontation Clause is the right of cross-examination, which is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1973). However, the Constitution does not guarantee "cross examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens*, 484 U.S. 554, 557 (1988) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

> Confrontation "(1) insures that the witness will give his statements under oath--thus impressing the witness with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for discovery of truth'; and (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *California v. Green*, 399 U.S. 149, 158 (1970) (citing 5 Wigmore § 1367).

Petitioner had ample opportunity, and fully exercised that opportunity, to extensively cross-examine Deputy Czarnowski, who had lifted the prints from the small television; Officer Major of the Kalamazoo Township Police Department, who received the prints from Deputy Czarnowski; and Officers Flowers and Westrate of the Michigan State Police, who compared the fingerprints lifted from the scene against Petitioner's fingerprints. This opportunity for examination alone ensured Petitioner's right of confrontation. *See California v. Trombetta*, 467 U.S. 479, 485 (1984). Petitioner's counsel had sufficient testimony from each witness to argue their respective lack of credibility, and the jury was able to observe the demeanor of each of the witnesses during their testimony. The fingerprints which were lifted from the small television were available for Petitioner's examination. The failure to preserve the small television from which the fingerprints

were taken did not deprive Petitioner of his right to present a defense in violation of the Confrontation Clause. The state court's determination was neither contrary to nor an unreasonable application of established Supreme Court precedent. Accordingly, the result of the decision by the Michigan Court of Appeals was a reasonable application of clearly established federal law as determined by the United States Supreme Court.

## II.  Prosecutorial Misconduct: Ground II

In his second ground for relief, Petitioner asserts that he was denied a fair trial when the prosecutor repeatedly made references to the "elderly" victims during his closing argument. Petitioner contends this appeal for sympathy was prejudicial to the outcome of his case as it shifted the focus of the jurors from guilt or innocence to an emotional response.

The Michigan Court of Appeals addressed the issue in part as follows:

> Defendant next argues that he was denied his right to a fair trial because the prosecutor repeatedly attempted to elicit sympathy for the elderly victims during closing argument. Because defendant did not object to the prosecutor's comments at trial, the issue is unpreserved and, accordingly, is reviewed for plain error. There is no error if the prejudicial effect of the improper comments could have been cured by a timely instruction.

(MCOA Op. at 4 (citations omitted)).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground

properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice." *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g., People v. Kelly*, 423 Mich. 261, 271 (1985). More specifically, it is clear that the contemporaneous objection rule to statements made in closing argument was well-established at the time of Petitioner's trial. *See, e.g., People v. Stanaway*, 521 N.W. 2d 557, 579 (1994)(citing cases). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See*

*Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

After expressly noting Petitioner's default in failing to object, the Michigan Court of Appeals then reviewed Petitioner's claim for plain error, finding none. In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

Petitioner has not even attempted to show cause for the failure to object at trial to the prosecutor's comments. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable

16

doubt.'" *Coleman v. Mitchell*, 244 F.3d 533, 540 (6th Cir. 2001) (quoting *Schlup*, 513 U.S. at 329). Accordingly, I conclude that Petitioner's second claim is procedurally defaulted.

### III.  Failure to suppress Petitioner's statements: Ground III

Petitioner next argues that the trial court should have suppressed Petitioner's alleged statements made to the police where the police failed to record the conversation and Petitioner denied making the statements. Respondent argues that this claim fails to set forth an arguable violation of Petitioner's federal constitutional rights. The court of appeals concluded as follows:

> Defendant also argues that the trial court should have suppressed the statements that he allegedly made to police because the police failed to make an audio or video recording of his interrogation. This identical argument was rejected by this Court in *People v. Fike*, 228 Mich. App. 178; 577 NW 2d 903 (1998). We are bound by that decision. MCR 7.215(I)(1). Further, we find no reason to revisit the issue. In *Fike*, *supra* at 183, this Court declined to impose "views of police practice into a constitutional mandate" because the Legislature had not "spoken on the subject." Given that the Legislature has still not deemed it appropriate to legislate police practice in this area, we find no cause to reconsider this Court's decision in *Fike*.

(MDOC Op. at 5).

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.

17

*Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster*, 324 F.3d at 429.

Petitioner has not alleged that the United States Supreme Court has established that criminal suspects have a constitutional right to have their interrogations recorded through audio and/or video recording. Because the United States Supreme Court has never established such a right, *see Crenshaw v. Renico,* 261 F. Supp. 2d 826, 837 (E.D. Mich., 2003), I conclude that this claim is not cognizable in a federal habeas corpus proceeding and may not be the basis of habeas relief.

### IV. Cumulative error: Ground IV

Petitioner maintains that the cumulative effect of the errors alleged entitles him to a new trial. Although Sixth Circuit precedent supports the proposition that errors that are harmless in isolation may require reversal when taken together, *see United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000); *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983), no United States Supreme Court precedent recognizes the cumulative error doctrine. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. Both because Petitioner has failed to demonstrate any errors to aggregate and because his claim depends on non-Supreme Court precedent, I conclude that Petitioner is not entitled to habeas corpus relief on this ground. *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: September 2, 2005   /s/ Ellen S. Carmody  
ELLEN S. CARMODY  
United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).